**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **SUANN CLOPTON and** | § | |
| **DAWN M. McGURY,** | § | |
| | § | |
| **v.** | § | **A-13-CV-205-LY** |
| | § | |
| **ANIMAL HEALTH INTERNATIONAL,** | § | |
| **INC. f/k/a/ LEXTRON.** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
         UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's Traditional and No-Evidence Motion for Summary Judgment Against Plaintiff Suanne Clopton (Dkt. No. 31); Plaintiff Suanne M. Clopton's Response (Dkt. No. 33); and Defendant's Reply (Dkt. No. 40). The undersigned submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(h) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I.  GENERAL BACKGROUND**

This is a sexual harassment, gender discrimination, and retaliation case. Plaintiff Suanne Clopton is a former employee of Animal Health International.[1] Animal Health (known as Lextron until June 2011) is a distributor of animal health products, including vaccines and pharmaceuticals.

---

[1] Animal Health filed separate summary judgment motions as to each of the two plaintiffs in this case. On November 13, 2014, the undersigned recommended that Animal Health's summary judgment motion against Dawn McGury be granted, and Judge Yeakel adopted that recommendation on December 17, 2014. *See* Dkt. Nos. 44, 47. While this Report and Recommendation addresses only Clopton's claims, because some of McGury's experiences are relevant to those claims, facts related to McGury are discussed at points herein.

Clopton worked as a sales in representative in Animal Health's Lago Vista, Texas office from February 2008, until she resigned on June 9, 2011. Dkt. No. 1 at 3.

Clopton alleges that while she was employed by Animal Health she was sexually harassed by warehouse manager Rigo Gutierrez, who she contends made sexually suggestive comments to her and others on an almost daily basis. *Id.* at 3-5. Clopton asserts that both she and her co-plaintiff Dawn McGury reported Gutierrez's sexual harassment to management on multiple occasions. *Id.* at 6. Specifically, she asserts that they complained to senior mangers Paul Covill and Mark Ziller, and office manager Misty Albright. *Id.* Clopton maintains that Covill and Ziller took no action. Clopton alleges that in 2010, she also contacted Tracy Scrivner in the company's Human Resources Department and reported Gutierrez's behavior along with management's failure to act. *Id.* Further, when McGury resigned on March 11, 2011, in her exit interview she described Gutierrez's behavior as a factor in her resignation. *Id.* at 7.

Clopton asserts that when she went to the warehouse for assistance on May 9, 2011, Gutierrez told her "I'm going to get fired today. . . .  I'm going to reach over and touch 'em, I really want to.  I'm going to get fired." *Id.* Clopton alleges he was looking at and referring to her breasts. *Id.* Clopton responded that if he touched her, she would go home and get her gun. *Id.* On May 16, 2011, Clopton talked to her inside sales manager, Debra Kampschneider, about the incident and Clopton revealed she had hired an attorney to assist her with the ongoing sexual harassment issues. *Id.* Shortly thereafter, Clopton received a call from Jon Ewert in Human Resources. *Id.* An investigation was initiated, and Gutierrez was ultimately terminated, after admitting he made the comments to Clopton. *Id.*

2

Clopton alleges that after Gutierrez was terminated she was treated like an outcast. *Id.* at 8. She alleges that Covill and Ziller stopped acknowledging her at the office, and Klampschneider informed her that she had ruined her relationship with other employees by reporting Gutierrez. *Id.* On June 7, 2011, during a periodic job review, Klampschneider told Clopton that there was nothing Clopton could do about the way the managers were now treating her. *Id.* On June 9, 2011, Clopton resigned, contending that she was being constructively discharged. *Id.*

## II.  SUMMARY JUDGMENT STANDARD

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III.  ANALYSIS

In its motion, Animal Health identifies seven grounds for summary judgment on Clopton's claims. As listed there, they are:

(a)  Clopton cannot establish that she suffered an adverse employment action;
(b)  Clopton cannot establish that Animal Health knew or should have known of the alleged sexual harassment prior to May 17, 2011;
(c)  Animal Health can conclusively prove a *Faragher-Ellerth* defense;
(d)  Clopton cannot produce evidence of retaliation beyond her own subjective belief;
(e)  Clopton cannot demonstrate a causal link between her complaint and any retaliation;
(f)  Clopton lacks evidence that she was constructively discharged; and
(g)  a reasonable employee would not have resigned under the circumstances Clopton experienced.

Finally, in its reply Animal Health adds a new argument, contending that Clopton's hostile environment claim may not rely on events outside the 300-day period prior to her EEOC charge.[2]

## A.   Sexual Harassment Claim

The creation of a hostile work environment through gender-based harassment is a form of discrimination proscribed by Title VII. *E.E.O.C. v. Boh Bros. Const. Co., LLC*, 731 F.3d 444, 452 (5th Cir. 2013); *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2455 (2013). To make out a sexual harassment claim, Clopton must show that: (1) she belongs to a protected class; (2) was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) Animal Health knew or should have known of the harassment, and failed to take remedial action. *Cain v. Blackwell*, 246 F.3d 758, 760 (5th Cir. 2001). Animal Health argues that Clopton has failed to demonstrate a genuine issue of material fact as to the fourth and fifth elements set out above. The Court will address them in reverse order.

### 1.   Knowledge of harassment and remedial actions

In determining whether an employer is liable for harassment committed by a coworker, courts apply a negligence standard. *Vance*, 133 S.Ct. at 2441. Here, Clopton alleges she was

---

[2]Animal Health's brief is poorly organized and confusing. For example, the first argument listed is that Clopton did not suffer an adverse employment action, yet nowhere in the brief does Animal Health actually discuss that issue in connection with the hostile environment claim, but instead rolls it into the argument that Clopton cannot demonstrate a constructive discharge, discussed it in the context of the retaliation claim only. Second, it lists as its fifth argument that Clopton cannot establish a causal link between her complaint and her termination, but this argument is never briefed anywhere in the motion (and thus is not discussed here). Finally, though the list purports to identify all of the motion's arguments, it makes no mention of a claim that actually *is* briefed—whether the harassment affected a term, condition, or privilege of Clopton's employment. For these reasons, in discussing the summary judgment motion the Court has not followed the structure of Animal Health's motion.

4

harassed by the warehouse manager, Rigo Gutierrez, a co-worker.  When a coworker harasses a plaintiff, "an employer is directly liable for [the co-worker's] unlawful harassment if it was negligent with respect to the offensive behavior."  *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 799 (1998)).  "In order to satisfy that standard, the complainant must show that the employer knew or should have known of the offensive conduct but failed to take appropriate action." *Id.* at 2456 (internal citations omitted).  Animal Health argues it was unaware of Gutierrez's harassment of Clopton until her complaint of May 17, 2011.  Dkt. No. 31 at 7.  It further asserts that upon learning of the harassment it took prompt remedial action and terminated Gutierrez.  *Id.*

The parties' positions on this issue could not be more divergent.  Animal Health argues that "[t]he undisputed facts in this case demonstrate that Clopton did not complain [about harassment] to any member of Animal Health's management until May 17, 2011," Dkt. No. 31 at 7, while Clopton contends that Gutierrez's offensive conduct "was reported multiple times to appropriate managers and human resources personnel," Dkt. No. 33 at 1.  It appears to the Court that Clopton's summary of the evidence is much more faithful to the record than Animal Health's.

In reviewing a summary judgment motion, the Court must view the facts in the light most favorable to the non-movant, Clopton here.  Applying this standard, there could not be more genuine issues of material fact regarding whether Animal Health knew or should have known of the harassment and failed to take prompt remedial action.  The evidence demonstrates that Lextron acquired what is now Animal Health in 2008, and shortly thereafter a survey was distributed to employees at the Lago Vista facility inquiring into any issues with harassment by warehouse employees.  Dkt. No. 33-4 (Ziller Depo.) at 24-25.  In their responses to the survey numerous women complained of sexually inappropriate comments and behavior by the warehouse staff.  *Id.*

5

at 36.   Two of the surveys mentioned Gutierrez by name as someone making inappropriate comments or engaging in inappropriate behavior.  Dkt. No. 33-8.  When deposed, McGury testified that shortly after the survey was conducted in 2008 she again reported harassment by Gutierrez to "Tracy [Scrivner]," "Mark [Ziller]," "Paul [Covill]," and "Misty [Albright]."   Dkt. No. 33-5 (McGury Depo.) at 167.[3]   Gutierrez was not reprimanded, written up or otherwise spoken to, however, because in Ziller's mind no one had made a "formal" complaint about him.  Dkt. No. 33-4 (Ziller Depo.) at 36-38.  The only action taken was Scrivner coming from Colorado and conducting sexual harassment training for the warehouse employees.  Dkt. No. 40-3 (Scrivner Depo.) at 45-46.

McGury testified that after the anonymous complaints, the warehouse employees made it difficult for the salespeople to get their work done.  Dkt. No. 33-5 at 166-67.  She testified that after the training she complained to Scrivner that the warehouse employees were still harassing women and that Gutierrez was making her job difficult.  *Id.* at 177.  She also testified that later she discussed the harassment with Albright and Scrivner over lunch, and that Scrivner told her that the only thing she could do was "go to Mark [Ziller]" or else "her hands were tied."  *Id.* at 179.  McGury told Scrivner that she did not want Scrivner to take the issues to Ziller because "as an employee it would hurt us more" if she did that, explaining that "[w]e've been through this, and what it [reporting the harassment] did was hurt us, and it hurt us for a long time and we don't want to do that again."  *Id.* at 179-80.

For her part, Clopton testified that about a month after the sexual harassment training in 2008, she complained to Albright about statements that Gutierrez made to her in the warehouse.

---

[3]Though the evidence does not clearly define each of their positions, it appears that Scrivner was the director of human resources;  Mark Ziller was the Lago Vista facility's lead manager;  Misty Albright was the facility's office manager;  and Paul Covill was an upper management employee.

Dkt. No. 33-1 (Clopton Depo.) at 185.  She testified that she again later complained to Albright that Gutierrez made other offensive comments to her, including calling her a "GILF."[4]  *Id.* at 223-24, 232.  She complained about the warehouse staff to Mark Ziller on at least two occasions, after the surveys were completed in 2008.  *Id.* at 60.  Clopton testified that she complained to Paul Covill about the comments from the warehouse staff "multiple times," again, after the surveys in 2008.  *Id.* at 202-03.  Finally, in 2010, Clopton complained to Scrivner about comments from Gutierrez.  *Id.* at 211-12.

Thus, it is plain that fact issues exist as to whether Animal Health knew or should have known about the ongoing sexually harassing conduct by the warehouse employees.  Clopton  has presented summary judgment evidence that she and McGury informed various managers of the harassment multiple times, and management certainly was aware that the harassing conduct was occurring.  Indeed, if Clopton's evidence is credited, there can be little question that Animal Health was actually aware of harassing conduct by Gutierrez after the training in 2008, and before the 2011 incident.  Animal Health's focus on whether a "formal" complaint was made misses the point, as the question is not whether a "complaint" as Animal Health understands that term was made, but rather whether it was aware that sexually harassing behavior was occurring.  The facts appear to be that several management level employees were aware of continuing offensive behavior by Gutierrez and others from 2008 through 2011.  At a minimum, there is a triable fact issue on the state of management's knowledge.

With regard to the issue of whether Animal Health failed to take remedial action after becoming aware of harassment, summary judgment is also inappropriate.  Animal Health argues that

---

[4]"GILF" stands for "Grandmother I'd Like to F#ck."

upon Clopton making a complaint about Gutierrez in 2011, it promptly conducted an investigation and terminated him.  This, however, fails to address the lack of action during the time period from the surveys in 2008 leading up to 2011.  In fact, despite the fact that Gutierrez was specifically named in the 2008 anonymous surveys, Animal Health admits that it did not take any action to investigate, counsel or reprimand him at that time.  Dkt. Nos. 33-4 (Ziller Depo.) at 36-38; and No. 40-3 (Scrivner Depo.) at 45-46.[5]  Further, Ziller claimed to be completely unaware of any complaint about Gutierrez before the 2011 complaint that led to his firing.  Dkt. No. 33-10 (stating that Clopton had never complained to him before, and that she had never made a complaint of sexual harassment before).  There are plainly fact issues as to whether Animal Health took prompt remedial action with regard to the complaints it was aware of in the period between 2008 and the May 17, 2011 incident.

### 2.    Did the harassment affect a term, condition, or privilege of employment?

In a hostile environment claim, the plaintiff must demonstrate that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment."  This requires that the "the conduct complained of must be both objectively and subjectively offensive.  Thus, not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive."  *E.E.O. C. v. WC & M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007) (internal citations omitted).  In determining whether the working environment is sufficiently abusive or hostile, courts look to the totality of the circumstances, including "the frequency of the conduct, its severity, the degree to which the conduct is physically

---

[5] Animal Health argues that Gutierrez was required to watch the anti-harassment video three times, while the other workers only had to watch it once.  This is of little impact, however, when it does not dispute that no one spoke to Gutierrez in 2008 to counsel him on his conduct, or to instruct him to cease his comments and behavior.

8

threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005).

In this case, Clopton testified that over the course of three years she was subjected to approximately 300 incidents of sexually offensive comments or conduct in the warehouse.  Dkt. No. 33-3 ¶ 15.  Among others things, she testified that Gutierrez did all of the following:

- asked her to sit in his lap;
- would ask her to shut the door so that they could have a "private meeting;"
- stated he'd like to "sleep with the grandma;"
- stated "come on, let's go out to the car",
- suggested that they go out to the parking lot to have sex;
- commented "I can make you feel better than you ever felt before;"
- stated "come on, you know that you want to get some of this;"
- commented about her clothes being "sexy;"
- looked down her shirt; and
- leered at her.

*Id.* at ¶ 3.  She stated that she avoided going to the warehouse, despite the fact that her job required it, because of this treatment. *Id.* at ¶ 8.

As with the previous issues, there is no question that Clopton has created a fact question as to whether the harassment she alleges was sufficiently abusive or hostile to alter the conditions of her employment.  *See, e.g., Garcia v. Garland Independent School Dist.*, 2013 WL 5299264 (N.D. Tex.2013); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000); *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996). Her evidence shows that the behavior occurred on a frequent basis, involved comments about her body that would be humiliating or offensive to a reasonable person, and that it affected her ability to perform her job.   Summary judgment is inappropriate on this issue.

### 3.     Faragher-Ellerth defense

Animal Health also argues that it has conclusively established a *Faragher-Ellerth* defense as a matter of law, relying on various of its sexual harassment complaint policies.  An employer is entitled to this defense if it demonstrates that (1) it exercised reasonable care to prevent and promptly correct the harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765  (1998).  This affirmative defense, however, does not apply to hostile work environment claims against coworkers—only to claims against supervisors.  *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 411 (5th Cir. 2002) (*Ellerth* and *Faragher* establish an affirmative defense for "supervisors only").  In this case, Clopton complains about ongoing sexual harassment by the warehouse employees, and Gutierrez in particular—none of whom remotely qualify as her supervisor.  In fact, Animal Health itself refers to Gutierrez as Clopton's "co-worker." Dkt. No. 31 at 7 (referring to Gutierrez as "a co-worker in a different department").   Animal Health's *Faragher/Ellerth* argument is specious, and should be denied.

### 4.     Continuing violation argument

In its reply, Animal Health argues for the first time that Clopton may not rely on the continuing violation doctrine to complain of actions prior to 2011.  Because this argument was not contained in its original motion, it is improper and untimely.  *See, e.g.  Springs Industries, Inc. v. American Motorists Ins. Co.*, 137 F.R.D. 238, 239–240 (N.D.Tex.1991).  Not considering the argument is appropriate because Animal Health did not request leave to make the new argument, and permitting it to do so deprives Clopton of a meaningful opportunity to respond.  *Id.*  The

10

argument is untimely because dispositive motions were due by October 10, 2014, *see* Dkt. No. 10, and the argument is only found in the reply, which was not filed until November 10, 2014. For these reasons alone, the Court should reject this argument.

Even if it had been properly raised, the argument lacks merit. It is premised on the rule that filing a timely charge of discrimination is a prerequisite to filing a Title VII suit, and wrongs committed more than 300 days before the filing of a charge are not actionable. As Animal Health notes, in a hostile environment case, a plaintiff is not limited to filing suit on events that fall within this time period because her claim "is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Thus, a court may consider "the entire scope of the hostile work environment claim," including behavior alleged outside the 300–day window, "so long as any act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105. However, the doctrine is limited: "the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it, precluding liability for preceding acts outside the filing window." *Id.*, 536 U.S. at 118, 120. Relying on this case law, Animal Health contends that Clopton's hostile environment claim should be limited in scope. Dkt. No. 40 at ¶ 25 (citing *Stewart v. Mississippi Transp. Com'n*, 586 F.3d 321, 328 (5th Cir. 2009)). It argues that the anti-harassment training it conducted in 2008 "broke the chain of continuous violations," and that Clopton "has not made even a meager attempt to illustrate another starting point." *Id.* at ¶ 26.

Animal Health's argument is not supported by the very case it cites. In that case, the court analyzed the issue by noting:

> The two periods of alleged harassment are, however, severed by the intervening acts of Stewart's employer.  When a company, once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability.  Prompt remedial action must be reasonably calculated to end the harassment.

*Stewart*, 586 F.3d at 329 (internal quotations and citations omitted).  As explained by the court, not just any action by the employer interrupts continuing behavior—the action must be reasonably calculated to end the harassment.   The employer's actions in *Stewart* went far beyond those Animal Health took here:

> after Stewart reported Loftin's inappropriate conduct to his supervisor, MDOT promptly reprimanded Loftin and, crucially, reassigned Stewart from Loftin's supervision. Stewart concedes that these acts ended Loftin's harassment for a period of sixteen months, until she was brought back under his supervision.

*Id.*  Thus, the harasser was reprimanded, he was separated from the victim, and the victim conceded that this ended the harassment for 16 months.  *See also, Carmon v. Lubrizol Corp.*, 17 F.3d 791, 793–94 (5th Cir.1994) (concluding hostile work environment claim failed because employer took prompt remedial action by interviewing the plaintiff the same day she first complained of harassment, issuing a memo to all employees condemning the conduct in question, and conducting an investigation which included interviewing witnesses).  In stark contrast to the actions in these cases, here Animal Health did not reprimand Gutierrez in 2008—in fact , it did not even speak to him about the allegations—and it did nothing to separate him from Clopton or McGury.

Moreover, this argument pays no more than lip service to the evidence actually in the record.  Animal Health claims that Clopton "has not made even a meager attempt to illustrate another starting point" after the 2008 training.  Dkt. No. 40.  at ¶ 26.  But as already noted, the summary judgment record contains evidence that the harassment by Gutierrez resumed just a month after the sexual harassment training video was shown in 2008, and management employees were aware of

this.  Dkt. No. 40-4 (Clopton Depo.) at 183-84; Dkt. No. 33-5 (McGury Depo.) at 171, 177-78.  The Court will not repeat the evidence summarized above of the many other times that Animal Health managers became aware of harassment in 2009 and 2010 as well.  The only remedial action Animal Health ever took prior to Gutierrez's firing in 2011 was the training in 2008.  On this record, the Court is frankly surprised that Animal Health is even raising this argument.  There is plainly a fact question as to whether Animal Health's actions in 2008 were remedial, and this argument is unsupported by the facts and the law.

## B.    Retaliation Claim

Animal Health identifies three reasons why it believes Clopton's retaliation claim should be dismissed.  First, it contends that the retaliation claim is supported solely by Clopton's subjective beliefs.  It further argues that Clopton lacks evidence that she was constructively discharged; and finally, it contends that a reasonable employee would not have resigned under the circumstances Clopton experienced.  To establish a prima facie case of retaliation under Title VII, a plaintiff must show "(1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."  *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

### 1.    Evidence of retaliation

As noted, Animal Health argues that Clopton cannot produce any evidence of retaliatory conduct beyond her subjective beliefs that other employees and management were ostracizing her.  A resignation such as Clopton's can only constitute an adverse employment action where the resignation amounts to a constructive discharge.  *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).  "To prove a constructive discharge, a plaintiff must establish that working

conditions were so intolerable that a reasonable employee would feel compelled to resign." *Id.* (internal quotation marks omitted) (quoting *Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997)). "Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge." *Id.* In evaluating whether a reasonable employee would feel compelled to resign, a court must consider whether the plaintiff experienced any demotions; reductions in salary or job responsibilities; job reassignments to menial or degrading work, or to a younger supervisor; badgering, harassment, or humiliation calculated to encourage resignation; offers of early retirement; or continued employment on terms less favorable than the employee's former status. *Id.* (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

With regard to the retaliation claim, while the case is closer than the hostile environment claim, ultimately the Court believes summary judgment is not warranted. Clopton has presented evidence that her supervisor Deb Kampschneider told her that she had "ruined [her] relationships" with her fellow employees by complaining about Gutierrez, and that there was nothing she could do about what Clopton viewed as retaliation from co-workers. Dkt. No. 33-1 (Clopton Depo.) at 120-23. Clopton presented evidence that after her complaint, Kampschneider began criticizing her job performance and that she was removed from certain accounts. *Id.* at 125. Clopton also testified that her outside sales representative, Melissa Westbrook—a person Clopton was required to work with to perform her job—would no longer actively communicate with Clopton about their accounts. *Id.* at 55. Clopton also presented evidence that Westbrook lamented Gutierrez's termination to another employee in an email that Westbrook accidentally sent to Clopton. *Id.* at p. 49 ("If only Rigo were here . . . need I say more?"). Finally, the record also demonstrates that after Clopton made her complaint about Gutierrez, HR representative Jon Ewert instructed Clopton's supervisor

14

to, for the first time, begin assembling a performance file on Clopton, and prepare documentation on performance-related conversations that had not been previously gathered or documented.  Dkt. No. 33-11.  ("Ultimately, the fear is that no matter what is done, Suanne will attempt to sue for retaliation.  And, as we have no real written performance documentation in file, we will need to create the file with what we have.")  This email was sent on May 25, 2011, about a week after Gutierrez was terminated.  *Id.*  Ewert testified that he did not make a similar directive about creating such files on any other employee.  Dkt. No. 33-2 (Ewart Depo.) at 42-43.

This testimony and evidence goes far beyond being merely Clopton's "subjective beliefs." Clopton did not merely testify that she believed acts were being taken in retaliation for her complaint, but rather pointed to specific facts—being removed from accounts, her outside sales representative not speaking with her, among others—that occurred shortly after she complained of harassment.  She also has demonstrated the existence of some evidence that relates these actions to her complaint, including the email bemoaning Gutierrez's firing, and Animal Health's HR employees advising Clopton's supervisor just a week after the complaint to begin "building a file" to support a termination.  While Animal Health obviously disputes that it or any of its employees acted with a retaliatory motive toward Clopton, there are enough fact questions on that issue to require the issue to go to a jury for decision.

### 2.   Constructive discharge

Animal Health's final two arguments on the retaliation claim ( Clopton has no evidence she was constructively discharged, and a reasonable employee would not have resigned under the circumstances) effectively are one and the same.  In essence, Animal Health faults Clopton for not first pursuing other remedies before she resigned, and questions whether the conditions merited a

resignation.  Again, the facts on this argument are far closer than on the hostile environment claim, but drawing viewing the evidence in the light most favorable to Clopton, there are enough facts in dispute on this point that a jury, not the Court,  should decide the reasonableness of the resignation.  Clopton's testimony demonstrates that employees she needed to interact with to do her job began avoiding her, and, though inadvertently, one let her know that she regretted that Gutierrez had been terminated.  Finally, most probative on this point are two pieces of evidence:  (1) when Clopton complained to her supervisor of what she perceived to be retaliation, her supervisor told her there was nothing she could do because Clopton had ruined her relationship with her co-workers by complaining about Gutierrez's conduct; and (2) shortly after her complaint against Gutierrez, Animal Health started putting together a file of evidence of Clopton's allegedly poor performance.  While certainly not dispositive of the issue, this is sufficient to create a fact question on whether the conditions merited Clopton feeling compelled to resign, and summary judgment would not be proper on this basis.

## IV.  RECOMMENDATION

Based upon the foregoing, the Magistrate Court **RECOMMENDS** that the District Court **DENY** Defendant's Traditional and No-Evidence Motion for Summary Judgment Against Plaintiff Suanne Clopton (Dkt. No. 31).

## V.  WARNINGS

The parties may file objections to this Report and Recommendation.   A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 19th day of December, 2014.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE